# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

In Re:

JAMES PATRICK O'NEAL,                         BK 08-70577-CMS-7

     Debtor.

JAMES PATRICK O'NEAL

     Plaintiff,                          AP 08-70024 CMS

vs.

UNITED STATES OF AMERICA,
DEPARTMENT OF INTERNAL
REVENUE SERVICE,

     Defendant.

## MEMORANDUM OPINION

This adversary proceeding came before the court on March 11, 2010, for hearing on the

Plaintiff's Motion for Summary Judgment. (AP Doc. 35).  Frederick Mott Garfield appeared on

behalf of James Patrick O'Neal ("Debtor"); Gregory L. Jones appeared on behalf of the Internal

Revenue Service, United States of America ("IRS").  After consideration of the evidence submitted

and the arguments of the parties this court **DENIES** the Debtor's Motion for Summary Judgment.

### JURISDICTION

The Bankruptcy Court has jurisdiction of this case pursuant to 28 U.S.C. § 1334(a).  This

court has jurisdiction of this issue, a core bankruptcy proceeding, pursuant to 28 U.S.C. § 157(b).

Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United

States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July

1

17, 1984.

## FINDINGS OF FACT

Debtor filed a voluntary, no asset Chapter 7 bankruptcy petition with this court on March 27, 2008. (Bk Docs. 1 & 19). At the time of the filing of this bankruptcy petition, Debtor was aware that he was indebted to the IRS for Form 1040 taxes and attendant penalties and interest for, inter alia, tax years 1994, 1995, 1996, 1997, 1998, 1999, 2002 and 2003. (AP Doc. 1). On June 25, 2008, Debtor filed this adversary proceeding seeking a determination that the tax liabilities due for the tax years listed above were dischargeable, alleging that such liabilities do not constitute priority debt. (AP Doc. 1). The IRS filed its answer on October 7, 2008, asserting that the tax liabilities were excepted from discharge pursuant to § 523(a)(1)(C). (AP Doc. 7).

Debtor is an attorney who began his career working at a CPA firm doing tax work in 1976. (AP Doc. 44, Pages 11-13) That tax work consisted mainly of tax planning and tax accruals for major financial corporations. Debtor did very little actual tax return work, but admits that he was knowledgeable about the tax code in place at that time. Debtor left the CPA firm in 1980 to work for an established law firm in Birmingham, Alabama, where he worked on lawsuits involving securities litigation against stockbrokers and insurance agents.

Debtor got married in 1977, and moved into a home located at 4005 Montevallo Road in 1978. (AP Doc. 44, Page 47). The house was small, and Debtor and his wife decided to build additions when their daughter was born in 1982. (AP Doc. 44, Page 63). A few years later, they decided to build a bigger house. Because their house was on a large lot, Debtor and his wife decided to split the lot and build a new home next door. Construction on the new house started in 1986. (AP Doc. 44, Page 47). Construction greatly exceeding the budget Debtor prepared and cost much more

2

than Debtor had anticipated, but the house was completed in 1988; Debtor and his family moved in that same year. (AP Doc. 44, Pages 48 & 61). Debtor sold 4005 Montevallo Road when he and his family moved into the new house, and all proceeds of the sale went into the new house at 4007 Montevallo Road. (AP Doc. 44, Page 48).

In the late 1980's, there were changes to Debtor's law firm and the area of law in which he practiced that adversely affected Debtor's income. Around this time, Debtor's personal and business expenses began to exceed his income. In fact, in 1988, Debtor took out all the money he had put into the law firm's partnership retirement account. (AP Doc. 44, Page 61). Debtor never opened another retirement account. (AP Doc. 44, Page 61). In 1993, Debtor decided to temporarily leave the Birmingham law firm to work as a contract attorney on a series of large, lucrative cases. As a result of his work on these cases, Plaintiff was paid large legal fees and reported $362,000.00 in adjusted gross income for the 1994 tax year. (AP Doc. 37, Exhibit B, Line 31).

The IRS received Debtor's 1994 tax return on August 23, 1996. Debtor reported $362,200.00 in adjusted gross income. (AP Doc. 43, Second Declaration of Gregory L. Jones). Although Debtor's tax return was due on April 15, 1995, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 1995. (AP Doc. 43, Exhibit D, Page 6). Debtor requested and was granted a second extension. The new due date for the filing of Debtor 's tax return was October 15, 1995. (AP Doc. 43, Exhibit D, Page 6). As noted above, the IRS did not receive Debtor's 1994 tax return until August 23, 1996. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. In fact, the documents produced by the IRS show that on March 6, 1996, there was an "inquiry for non-filing of tax return." (AP Doc. 43, Exhibit D, Page 6). The IRS also charged

Debtor a "penalty for filing tax return after the due date." (AP Doc. 43, Exhibit D, Page 6). Debtor stated that he filed his tax return after the initial April 15, 1995 deadline because he was attempting to avoid collection activity by the IRS. (AP Doc. 44, Page 143).

During 1994, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1994 tax return. Despite knowing that he would have to pay taxes on the large sum of money he received in 1994, Debtor did not make any payments on the taxes due for the 1994 tax year because there was no money available after he paid his living expenses and paid back other creditors to whom he owed money. (AP Doc. 44, Pages 111-112). Debtor specifically stated in his deposition that he paid back some $60,000.00 in past-due credit cards on which he had charged living expenses; that he might have paid back some 90-day notes from bank that he borrowed in order to pay living expenses; that he paid his former law firm anywhere from $50,000.00 to $150,000.00 in order to repay past due firm overhead expenses.[1] (AP Doc. 44, Pages 74-75). There is also some evidence that Debtor paid $50,000.00 to the IRS in 1994 for payment of back taxes. O'Neal v. O'Neal, 678 So. 2d 161, 163 (Ala. Civ. App. 1996).

In his deposition, Debtor asserted that his monthly expenses during 1994 were between $5,000.00 and $7,000.00 per month. Debtor asserted that he paid $4,000.00 per month for mortgage payments on the marital home; and $1,000.00 per month for his American Express bill. Debtor also had to pay monthly bills for food, clothing, electricity, and a cell phone. (AP Doc. 44, Page 76). Debtor did not have any regular monthly business expenses in 1994 because the attorney he contracted with paid all overhead expenses. (AP Doc. 44, Page 74).

---

[1] Debtor further stated that some of the debts that he paid back were outstanding when Debtor and his family took a four-day vacation to London, England. (AP Doc. 44, Page 96).

4

Although 1994 was Debtor's peak income year due to legal fees from the settlement of a large case, it was also the year that Debtor got divorced. Financial difficulties caused strain on Debtor's marriage, and the divorce was finalized in August of 1994 after a trial on the merits. Debtor subsequently filed an appeal of the trial court's decree, but the appeal was unsuccessful. Pursuant to the divorce decree, Debtor was required to pay $1,500.00 per month in alimony, $1,200.00 per month in child support, and roughly $4,000.00 per month to keep up the house payment.[2] (AP Doc. 44, Pages 59-60). In her deposition, Debtor's ex-wife asserts that Debtor did not make all of the child support and alimony payments. Specifically, Debtor 's ex-wife states that in 2000, Debtor owed her over $100,000.00 in back alimony and child support. (AP Doc. 45, Page 19). This arrearage would account of 37 months of alimony and child support from 1994 through 2000. The Debtor's obligation to pay alimony and child support was modified in 2000 to reduce his payments for alimony to $750.00 per month and reduce the child support obligation to $750.00 per month. (AP Doc 45, Page 19) The divorce decree also required that Debtor pay his ex-wife's attorney's fees and a $10,000.00 marital debt. (AP Doc. 44, Page 59). There is no evidence as to whether or not the Debtor paid these obligations.

Because Debtor was no longer living in the marital home in 1994, he also had to pay $1,000.00 a month to rent an apartment for himself. (AP Doc. 44, Page 78). Debtor also continued to pay for all of his daughter's school and extracurricular activities, which included horse activities

---

[2]Debtor appealed his divorce decree to the Civil Court of Appeals of Alabama. In the written opinion handed down by that court, the recitation of facts states that Debtor was ordered to pay $1,200 in child support, $1,500 in alimony, to maintain a $1,000,000.00 life insurance policy and to maintain medical and dental insurance coverage on Debtor 's minor child. O'Neal v. O'Neal, 678 So. 2d 161, 163 (Ala. Civ. App. 1996). The trial court also ordered that Debtor and his wife sell the marital home and split the proceeds. Id. Debtor's ex-wife was to live in the marital home pending its sale, and Debtor was to make the $2,700.00 mortgage payments. Id.

Case 08-70024-CMS    Doc 48    Filed 08/26/10    Entered 08/26/10 09:45:40    Desc Main
Document    Page 5 of 23

and dance. (AP Doc. 44, Page 79). Specifically, Debtor paid for riding lessons every week (some weeks his daughter took multiple lessons), dance lessons every week, and at least three summer camps every year, (AP Doc. 44, Pages 83-90). Debtor stated that at the time of his divorce he had $80,000.00 in cash. (AP Doc. 44, Page 119). Debtor stated that he used this money to pay for his own living expenses and to comply with the divorce decree. (AP Doc. 44, Pages 120-121). Debtor stated that the judge presiding over his divorce would not allow Debtor to set aside any reserve to pay taxes. (AP Doc. 44, Page 113).

Debtor 's ex-wife testified in her deposition that Debtor purchased a Lexus and also joined the Old Overton Country Club in 1994. (AP Doc. 45, Page 26).

Sometime in 1994 or 1995, Debtor went back to work at the Birmingham law firm.[3] At that point, Debtor became responsible for paying roughly $5,000.00 per month in overhead costs. (AP Doc. 44, Page 73).

The IRS received Debtor's 1995 tax return on January 30, 1997. Debtor reported $27,857.00 in adjusted gross income. (AP Doc. 43, Exhibit D, Page 7). Although Debtor's tax return was due on April 15, 1996, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 1996. (AP Doc. 43, Exhibit D, Page 8). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 1996. (AP Doc. 43, Exhibit D, Page 8). As noted above, the IRS did not receive Debtor's 1995 tax return until January 30, 1997. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. In fact, the documents produced by the IRS

---

[3]Debtor's practice was successful until he faced adverse changes in the law governing consumer fraud cases.

6

show that on January 28, 1997, there was an "inquiry for non-filing of tax return." (AP Doc. 43, Exhibit D, Page 8). The IRS also charged Debtor a "penalty for filing tax return after the due date." (AP Doc. 43, Exhibit D, Page 8). During the year of 1995, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1995 tax return. Despite knowing that he would have to pay taxes on money he received in 1995, Debtor did not make any payments on the taxes due for the 1995 tax year because there was no money available after he paid his living expenses. (AP Doc. 36). Debtor specifically mentioned that his overhead expenses at the Birmingham law firm were $5,000 to $8,000 per month and that he was obligated to pay alimony and child support to his ex-wife. (AP Doc. 44, Page 29).

The IRS received Debtor's 1996 tax return on October 21, 1997. Debtor reported $28,475.00 in adjusted gross income. (AP Doc. 43, Exhibit D, Page 9). Although Debtor's tax return was due on April 15, 1997, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 1997. (AP Doc. 43, Exhibit D, Page 10). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 1997. (AP Doc. 43, Exhibit D, Page 10). As noted above, the IRS did not receive Debtor's 1996 tax return until October 21, 1997. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. There also is no evidence that the tax return was postmarked before the filing deadline, although the IRS transcript does not indicate that there was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return after the due date. (AP Doc. 43, Exhibit D, Page 10). During the year of 1996, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1996 tax return. Despite knowing that he would have to pay taxes

7

on money he received in 1996, Debtor did not make any payments on the taxes due for the 1996 tax year because there was no money available after he paid his living expenses. (AP Doc. 36). Debtor specifically mentioned that his overhead expenses at the Birmingham law firm were $5,000 to $8,000 per month and that he was obligated to pay alimony and child support to his ex-wife. (AP Doc. 44, Page 29).

The IRS received Debtor's 1997 tax return on October 19, 1998. Debtor reported $39,229.00 in adjusted gross income. (AP Doc. 43, Exhibit D, Page 11). Although Debtor's tax return was due on April 15, 1998, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 1998. (AP Doc. 43, Exhibit D, Page 12). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 1998. (AP Doc. 43, Exhibit D, Page 12). As noted above, the IRS did not receive Debtor's 1997 tax return until October 19, 1998. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. There also is no evidence that the tax return was postmarked before the filing deadline, although the IRS transcript does not indicate that there was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return after the due date. (AP Doc. 43, Exhibit D, Page 12). During the year of 1997, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1997 tax return. Despite knowing that he would have to pay taxes on money he received in 1997, Debtor did not make any payments on the taxes due for the 1997 tax year because there was no money available after he paid his living expenses. (AP Doc. 36). Debtor specifically mentioned that his overhead expenses at the Birmingham law firm were $5,000 to $8,000 per month and that he was obligated to pay alimony and child support to his ex-

wife. (AP Doc. 44, Page 29). In addition, Debtor filed bankruptcy in 1997. Debtor decided to file bankruptcy because he received a foreclosure notice on the family home in which his ex-wife and daughter resided. He filed bankruptcy to try and prevent the foreclosure. The case was ultimately dismissed for failure to make plan payments.

The IRS received Debtor's 1998 tax return on October 19, 1999. Debtor reported $60,690.00 in adjusted gross income. (AP Doc. 43, Exhibit D, Page 13). Although Debtor's tax return was due on April 15, 1999, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 1999. (AP Doc. 43, Exhibit D, Page 14). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 1999. (AP Doc. 43, Exhibit D, Page 14). As noted above, the IRS did not receive Debtor's 1998 tax return until October 19, 1999. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. There also is no evidence that the tax return was postmarked before the filing deadline, although the IRS transcript does not indicate that there was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return after the due date. (AP Doc. 43, Exhibit D, Page 14). During the year of 1998, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1998 tax return. Despite knowing that he would have to pay taxes on money he received in 1998, Debtor did not make any payments on the taxes due for the 1998 tax year because there was no money available after he paid his living expenses. (AP Doc. 36). Debtor specifically mentioned that his overhead expenses at the Birmingham law firm were $5,000 to $8,000 per month and that he was obligated to pay alimony and child support to his ex-wife. (AP Doc. 44, Page 29). Debtor's house, in which his ex-wife and daughter lived, went into

9

foreclosure in 1998. Debtor's ex-wife's family purchased the home at foreclosure, and Debtor did not receive any proceeds from the sale. It is not clear from Debtor's deposition whether Debtor was still responsible for paying the mortgage on the house and the amount of any such mortgage.

The IRS received Debtor's 1999 tax return on October 19, 2000. Debtor reported $31,559.00 in adjusted gross income. (AP Doc. 43, Exhibit D, Page 15). Although Debtor's tax return was due on April 15, 2000, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 2000. (AP Doc. 43, Exhibit D, Page 16). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 2000. (AP Doc. 43, Exhibit D, Page 16). As noted above, the IRS did not receive Debtor's 1999 tax return until October 19, 2000. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. There also is no evidence that the tax return was postmarked before the filing deadline, although the IRS transcript does not indicate that there was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return after the due date. (AP Doc. 43, Exhibit D, Page 16). During the year of 1999, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1999 tax return. Despite knowing that he would have to pay taxes on money he received in 1999, Debtor did not make any payments on the taxes due for the 1999 tax year because there was no money available after he paid his living expenses. (AP Doc. 36). Debtor specifically mentioned that his overhead expenses at the Birmingham law firm were $5,000 to $8,000 per month and that he was obligated to pay alimony and child support to his ex-wife. (AP Doc. 44, Page 29).

The IRS received Debtor's 2000 tax return on October 18, 2001. Debtor reported $44,987.00

in adjusted gross income.  (AP Doc. 43, Exhibit D, Page 17).  Although Debtor's tax return was due

on April 15, 2001, Debtor requested an extension.  This request was granted and the new due date

for the filing of Debtor's tax return was August 15, 2001.  (AP Doc. 43, Exhibit D, Page 18).  Debtor

requested and was granted a second extension.  The new due date for the filing of Debtor's tax return

was October 15, 2001.  (AP Doc. 43, Exhibit D, Page 18).  As noted above, the IRS did not receive

Debtor's 2000 tax return until October 18, 2001.  Although Debtor  asserts that this tax return was

timely filed, there is no evidence of another extension.  There also is no evidence that the tax return

was postmarked before the filing deadline, although the IRS transcript does not indicate that there

was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return

after the due date.  (AP Doc. 43, Exhibit D, Page 18).  During the year of 2000, Debtor did not make

any quarterly estimated tax payments, nor did Debtor make any payment when he requested an

extension of the filing date for his 2000 tax return.  Despite knowing that he would have to pay taxes

on money he received in 2000, Debtor did not make any payments on the taxes due for the 2000 tax

year because there was no money available after he paid his living expenses.  (AP Doc. 36).  Debtor

left the Birmingham law firm in 2000; therefore, he was no longer responsible for the $5,000 to

$8,000 per month overhead expenses.  (AP Doc. 44, Page 37).  Debtor  was still obligated to pay

alimony and child support to his ex-wife.  (AP Doc. 44, Page 29).

The IRS received Debtor's 2001 tax return on October 17, 2002.  Debtor reported $37,829.00

in adjusted gross income.  (AP Doc. 43, Exhibit D, Page 19).  Although Debtor's tax return was due

on April 15, 2002, Debtor  requested an extension.  This request was granted and the new due date

for the filing of Debtor's tax return was August 15, 2002.  (AP Doc. 43, Exhibit D, Page 20).  Debtor

requested and was granted a second extension.  The new due date for the filing of Debtor's tax return

11

was October 15, 2002. (AP Doc. 43, Exhibit D, Page 20). As noted above, the IRS did not receive Debtor's 2002 tax return until October 17, 2002. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. There also is no evidence that the tax return was postmarked before the filing deadline, although the IRS transcript does not indicate that there was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return after the due date. (AP Doc. 43, Exhibit D, Page 20). During the year of 2001, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 2001 tax return. Despite knowing that he would have to pay taxes on money he received in 2001, Debtor did not make any payments on the taxes due for the 2001 tax year because there was no money available after he paid his living expenses. (AP Doc. 36). Debtor specifically mentioned that he was obligated to pay alimony and child support to his ex-wife. (AP Doc. 44, Page 29).

The IRS received Debtor's 2002 tax return on October 20, 2003. Debtor reported $29,621.00 in adjusted gross income. (AP Doc. 43, Exhibit D, Page 21). Although Debtor's tax return was due on April 15, 2003, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor 's tax return was August 15, 2003. (AP Doc. 43, Exhibit D, Page 22). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 2003. (AP Doc. 43, Exhibit D, Page 20). As noted above, the IRS did not receive Debtor 's 2002 tax return until October 20, 2003. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. There also is no evidence that the tax return was postmarked before the filing deadline, although the IRS transcript does not indicate that there was an inquiry for non-filing of tax return or that there was a penalty assessed for filing the tax return

12

after the due date.  (AP Doc. 43, Exhibit D, Page 22).   During the year of 2002, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 2002 tax return.  Despite knowing that he would have to pay taxes on money he received in 2002, Debtor did not make any payments on the taxes due for the 2002 tax year because there was no money available after he paid his living expenses.  (AP Doc. 36).  Debtor specifically mentioned that he was obligated to pay alimony and child support to his ex-wife.  (AP Doc. 44, Page 29).

As laid out in detail above, Debtor  requested two extensions for every tax year at issue in this adversary proceeding.  Furthermore, Debtor admitted that he sought these extensions to delay the collection activities of the IRS.  (AP Doc. 44, Page 129).

Although Debtor was not able to provide any specific timeline, he asserted that he had an alcohol problem beginning around 1994 and that he did not seek treatment for his problem until 2005.  After completing his treatment, Debtor lived in a halfway house in Tuscaloosa, Alabama for some period of time.  Debtor testified in his deposition that his alcoholism got steadily worse over the years and that eventually it make him unable to work and he became homeless.  (AP Doc. 44, Pages 148-150).  Debtor  asserted in his deposition that his alcoholism contributed to his inability to pay his taxes for the tax years 1994 through 2002.

## CONCLUSIONS OF LAW

On March 27, 2008, Debtor  filed a voluntary Chapter 7 bankruptcy petition.  On June 25, 2008, Debtor commenced an adversary proceeding in this court by filing a complaint seeking a determination that his tax liabilities for the 1994, 1995, 1996, 1997, 1998, 1999, 2002 and 2003 tax years were dischargeable because such liabilities did not constitute priority tax liability.   The IRS

13

opposed the relief requested by Debtor by asserting in its answer that Debtor had willfully attempted to evade and defeat the taxes owed for the 1994, 1995, 1996, 1997, 1998, 1999, 2002 and 2003 tax years, and therefore, the tax liabilities for those years were excepted from discharge pursuant to § 523(a)(1)(C). Debtor disagrees with the IRS's assertion and filed this Motion for Summary Judgment seeking a determination that Debtor was entitled to judgment as a matter of law on the issue of dischargeability.

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings pursuant to Bankruptcy Rule 7056, governs the procedures for summary judgment and provides in pertinent part: "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(c)(2). In reviewing a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "The burden of showing the absence of any genuine dispute as to material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The court will now determine whether Debtor has shown that there is no genuine issues as to any material fact and whether Debtor is entitled as to judgment as a matter of law on the issue of whether the debt owed to it is dischargeable pursuant to § 523(a)(1)(C).

An individual debtor who files a petition under Chapter 7 of the Bankruptcy Code is generally granted a discharge from all debts that arose before the filing of the bankruptcy petition. 11 U.S.C. § 727(b). However, certain acts or conduct of the debtor can lead to the forfeiture, either in whole or in part, of such discharge. See, e.g., 11 U.S.C. § 523. At issue here is whether the

exception to a debtor's general discharge laid out in § 523(a)(1)(C) is applicable in this case.

"Exceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in

favor of the debtor." U.S. v. Fretz (In re Fretz), 244 F. 3d 1323, 1327 (11th Cir. 2001). Section

523(a)(1)(C) provides:

> (a) A discharge under section 727 . . . . of this title does not discharge an individual debtor
> from any debt-
>> (1) for a tax or a customs duty -
>>> (C) with respect to which the debtor made a fraudulent return or willfully
>>> attempted in any manner to evade or defeat such tax;

11 U.S.C. § 523(a)(1)(C). Pursuant to § 523(a)(1)(C), there are two circumstances under which a

tax debt owed by a debtor is excepted from discharge. The first circumstance is applicable when a

debtor "made a fraudulent return." Because the IRS does not contend that Debtor "made a fraudulent

return," the first circumstance is not at issue in this case. The second circumstance is applicable

when a debtor "willfully attempted in any manner to evade or defeat such tax." Because the IRS

contends that Debtor "willfully attempted in any manner to evade or defeat" the taxes owed for the

tax years 1994-2002, the second circumstance is at issue in this case.

"The plain language of the second prong of § 523(a)(1)(C) contains a conduct requirement

(that the debtor 'attempted in any manner to evade or defeat [a] tax') and a mental state requirement

(that the attempt was done 'willfully"). In re Fretz, 244 F. 3d at 1327 (quoting 11 U.S.C. §

523(a)(1)(C)). To prove that the debt owed to the IRS is not excepted from discharge pursuant to

§ 523(a)(1)(C), in a summary judgment context, Debtor must establish that there is no genuine issue

of material fact and that he is entitled to judgment as a matter of law as to all elements of §

523(a)(1)(C).

"[T]he conduct requirement of § 523(a)(1)(C) is not satisfied where a debtor has filed

15

accurate tax returns and simply failed to pay taxes . . . .The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes . . . ." Id. at 1328-29. The uncontroverted evidence in this case shows the following:

(1) <u>1994</u> - Debtor requested two extensions of the filing date for his 1994 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 1994 tax returns was October 15, 1995. The IRS did not receive Debtor's 1994 tax return until August 23, 1996. Debtor testified at his deposition that he filed his tax return after the initial April 15, 1995 deadline because he was attempting to avoid collection activity by the IRS.

(2) <u>1995</u> - Debtor requested two extensions of the filing date for his 1995 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 1995 tax returns was October 15, 1996. The IRS did not receive Debtor's 1995 tax return until January 30, 1997. Debtor testified at his deposition that he filed his tax return after the initial April 15, 1996 deadline because he was attempting to avoid collection activity by the IRS.

(3) <u>1996</u> - Debtor requested two extensions of the filing date for his 1996 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 1996 tax returns was October 15, 1997. The IRS did not receive Debtor's 1996 tax return until October 21, 1997. Debtor testified at his deposition that he filed his tax return after the initial April 15, 1997 deadline because he was attempting to avoid collection activity by the IRS.

(4) <u>1997</u> - Debtor requested two extensions of the filing date for his 1997 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 1997 tax returns was October 15, 1998. The IRS did not receive Debtor's 1997 tax return until October 19, 1998. Debtor testified at his deposition that he filed his tax return after the initial April 15, 1998 deadline because

16

he was attempting to avoid collection activity by the IRS.

(5) <u>1998</u> - Debtor requested two extensions of the filing date for his 1998 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 1998 tax returns was October 15, 1999. The IRS did not receive Debtor's 1998 tax return until October 19, 1999. Debtor testified at his deposition that he filed his tax return after the initial April 15, 1999 deadline because he was attempting to avoid collection activity by the IRS.

(6) <u>1999</u> - Debtor requested two extensions of the filing date for his 1999 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 1999 tax returns was October 15, 2000. The IRS did not receive Debtor's 1999 tax return until October 19, 2000. Debtor testified at his deposition that he filed his tax return after the initial April 15, 2000 deadline because he was attempting to avoid collection activity by the IRS.

(7) <u>2000</u> - Debtor's original complaint alleges no taxes due for the year 2000, but AP Doc. 43, Exhibit D, Page 17, shows a tax debt for that year. Debtor requested two extensions of the filing date for his 2000 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 2000 tax returns was October 15, 2001. The IRS did not receive Debtor's 2000 tax return until October 18, 2001. Debtor testified at his deposition that he filed his tax return after the initial April 15, 2001 deadline because he was attempting to avoid collection activity by the IRS.

(8) <u>2001</u> - Debtor's original complaint alleges no taxes due for the year 2001, but AP Doc. 32, Exhibit D, Page 19, shows a tax debt for that year. Debtor requested two extensions of the filing date for his 2001 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 2001 tax returns was October 15, 2002. The IRS did not receive Debtor's 2001 tax return until October 17, 2002. Debtor testified at his deposition that he filed his tax return after the initial April

17

15, 2002 deadline because he was attempting to avoid collection activity by the IRS.

(9) <u>2002</u> - Debtor requested two extensions of the filing date for his 2002 tax returns. Debtor was granted both requests, and the new deadline for the filing of his 2002 tax returns was October 15, 2003. The IRS did not receive Debtor's 2002 tax return until October 20, 2003. Debtor testified at his deposition that he filed his tax return after the initial April 15, 2003 deadline because he was attempting to avoid collection activity by the IRS.

As laid out in detail above, Debtor requested two extensions for every tax year at issue in this adversary proceeding. Debtor admitted that he sought these extensions to delay the collection activities of the IRS. (AP Doc. 44, Page 129). These facts clearly show that Debtor engaged in "affirmative acts to avoid payment or collection of taxes." Debtor sought extensions of the deadline for filing taxes, affirmative acts by him, in order to avoid the collection of taxes. Debtor has failed to prove that his actions do not satisfy the conduct requirement of § 523(a)(1)(C) as a matter of law.

The mental requirement of § 523(a)(1)(C) requires that the attempt to evade collection of taxes be done "willfully." 11 U.S.C. § 523(a)(1)(C). The willfulness requirement "'prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate.'" <u>Id.</u> (quoting <u>In re Birkenstock</u>, 87 F. 3d 947, 952 (7th Cir. 1996)) "[A] debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally." <u>In re Fretz</u>, 244 F. 3d at 1330. "Fraudulent intent is not required." <u>Id.</u> Therefore, in order for the court to grant summary judgment in favor of the Debtor, there must be no genuine issue of a material fact that he did not "voluntarily, consciously or knowingly, and intentionally" avoid his obligation to pay taxes as a matter of law: (1) Debtor did not have a duty to file income tax

18

returns and pay taxes; (2) Debtor did not know he had a duty to file income tax returns and pay taxes; or (3) Debtor did not voluntarily and intentionally violate the duty to file income tax returns and pay taxes. Id. In his deposition, Debtor testified that he knew he was required to pay taxes and that he did not make any payments to the IRS because there was no money available after he paid his living expenses and other creditors, namely his ex-wife. Based upon Debtor's own testimony, it is undisputed that Debtor had a duty to pay taxes and that he was aware of that duty. Therefore, there is not uncontroverted evidence that he did not voluntarily and intentionally violate the duty to file income tax returns and pay taxes. The IRS argues that Debtor made a conscious choice not to pay his taxes because Debtor had enough funds to pay his taxes, but chose to use his financial resources for other purposes. The IRS made a similar argument in the Haas case handed down by the Eleventh Circuit Court of Appeals, and this was the Court's response:

> Her failure to pay the IRS is the result not of dishonesty but of the defining characteristic of all debtors-honest and dishonest, alike-insufficient resources to honor all of her obligations. Similarly, Haas technically had the financial ability to pay his taxes, but he still lacked the resources to pay all of his debts. That he decided to use his limited funds to satisfy obligations other than his properly acknowledged income taxes does not render him a dishonest debtor, simply a debtor.

Hass v. Internal Revenue Service (In re Haas), 48 F.3d 1153, 1156 (11th Cir. 1995), *overruled on other grounds by* Griffith v. United States of America (In re Griffith), 206 F.3d 1389, 1395-96 (11 th Cir. 2000).[4] Despite this language of the Eleventh Circuit Court of Appeals, this court feels that there is room to find that debtors with limited financial resources willfully failed to pay taxes.

> "Debtors with an ability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax

---

[4]It is not clear from the facts recited in the Haas case what income the debtor was receiving during the years he did not pay his taxes. It also is not clear whether the debtor in Haas was ever the recipient of a large sum of money with which he could have paid his tax obligations.

Case 08-70024-CMS    Doc 48    Filed 08/26/10    Entered 08/26/10 09:45:40    Desc Main
Document    Page 19 of 23

obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their debts excepted from discharge."

Lacheen v. Internal Revenue Service (In re Lacheen), 365 B.R. 475, 486 (Bankr. E.D. Pa. 2007) (quoting United States of America v. Angel (In re Angel), No. 93-1230, 1994 WL 69516, at *4 (Bankr. W.D. Okl. Feb. 24, 1994). In reconciling these two statements, this court has come to the conclusion that a debtor who is unable to pay his taxes because he expended his limited financial resources on legitimate business expenses and/or necessary living expenses, or because he paid creditors who were owed money as a result of any of the previously listed items, has not willfully failed to pay his taxes; however, a debtor who is unable to pay his taxes because he expended his limited financial resources on illegitimate business expenses, unnecessary living expenses, luxury items, or because he paid creditors who were owed money as a result of any of the previously listed items, such debtor has willfully failed to pay his taxes. Based upon the evidence submitted, this court is unable to determine whether Debtor falls into the latter category without making a determination as to Debtor's credibility. In other words, this court finds that there is an issue of material fact as to whether Debtor used the monies he received in the relevant years for legitimate business expenses and necessary living expenses or whether he used such monies for other purposes. An analysis of the court's finding for each tax year follows.

The court only has detailed information about the 1994 tax year. Debtor received roughly $360,000.00 in adjusted gross income during 1994. However, Debtor testified in his deposition that he paid living expenses and various other creditors so that when the time came to pay the IRS, there was no money left over. First, Debtor stated in his deposition that he paid between $50,000.00 and $150,000.00 in past-due overhead expenses to a former employer. While the court believes this to

20

be a legitimate business expense because Debtor planned to return to work at his former employer, a fact determination needs to be made as to how much money he paid; a $100,000.00 margin of error is simply not acceptable (The Debtor's 1994 tax return reflected taxes due of $129,941.00).  In addition, Debtor testified in his deposition that he paid off credit cards and 90-day notes when he received the lump-sum attorney fees in 1994, but there was no evidence of how much was paid on these debts.  He also testified that he had put living expenses on his credit card and that he took out the 90-day notes to also pay for living expenses.  However, there is no indication of what Debtor 's personal expenses were for the time period in question.

The court has no evidence as to the cost of the vacations Debtor and his family took in the years when Debtor did not pay his taxes and more information is needed regarding the amount of money that Debtor spent per month on his daughter's extracurricular activities.  This court has no explanation as to why Debtor purchased a Lexus, a luxury vehicle, and also joined the Overton Country Club in 1994, or how much these items cost.

For the tax years 1995, 1996, 1997, 1998, 1999, 2002, and 2003 there is very little information that was submitted to the court.  The court has Debtor's adjusted gross income for each year courtesy of the IRS, but does not have detailed information regarding Debtor's expenses.  For instance, Debtor  testified that at some point, he stopped paying child support and began paying college tuition for his daughter, but there is no testimony as to what year this occurred and no testimony as to how much Debtor paid in tuition per year.  In addition, the testimony of Debtor's ex-wife in her deposition indicates that Debtor  was not paying his monthly alimony and child support obligations during the time period in question.  Specifically, she testified that Debtor owed her over $100,000.00 in 2000 for back child support and alimony and the payments were reduced in the year

Case 08-70024-CMS    Doc 48    Filed 08/26/10    Entered 08/26/10 09:45:40    Desc Main
Document      Page 21 of 23

2000 to $750.00 per month for child support and $750.00 per month for alimony. To add to the confusion, Debtor testified that he paid the mortgage on the family home pursuant to the divorce decree, but it is unclear what amount he paid: Debtor states in his deposition that he paid around $4,000.00 per month, but the divorce decree states that Debtor paid $2,700.00 per month. In addition, the family home was sold in foreclosure in 1998, indicating that mortgage payments had not been paid by the Debtor out of his earnings. It is not clear whether Debtor continued to pay the housing costs of his ex-wife after the marital home went into foreclosure, or if he ever paid them. There is no indication of what Debtor's personal expenses were for the time period in question. For example, it is not clear how much Debtor paid in rent each year, how much Debtor paid in utility bills each year, how much Debtor spent on food each year, or how much Debtor spent on clothing each year. In addition, Debtor admitted that he had a drinking problem throughout the time period in question. There is no evidence as to how much of the Debtor's expenses he referred to as "living expenses" were expenses related to his problem with alcohol.

In short, there are discrepancies between Debtor's account of events, the ex-wife's account of events, and the account of events detailed in the divorce decree. There is no uncontroverted evidence detailing the personal expenditures of Debtor during the relevant time period, i,e, 1994-2002. Without such uncontroverted evidence, this court cannot find, as a matter of law, that Debtor did not voluntarily and intentionally violate the duty to file income tax returns and pay taxes for the tax years 1994-2002.

While a trial on the merits may show that Debtor did not willfully avoid or evade his duty to pay income taxes for the tax years 1994-2002, Debtor failed to show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law on the issue. Therefore,

22

Debtor's request for summary judgment as to that issue is due to be denied.

## CONCLUSION

The court finds that Debtor failed to show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law as to the cause of action brought pursuant to § 523(a)(1)(C). Therefore, the court **DENIES** Debtor's Motion for Summary Judgment.

**DONE and ORDERED** this August 26, 2010.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

Case 08-70024-CMS    Doc 48    Filed 08/26/10    Entered 08/26/10 09:45:40    Desc Main
Document      Page 23 of 23