UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

In Re:

JAMES PATRICK O'NEAL,                                BK 08-70577-CMS-7

    Debtor.

JAMES PATRICK O'NEAL

    Plaintiff,                                                 AP 08-70024 CMS

vs.

UNITED STATES OF AMERICA,
DEPARTMENT OF INTERNAL
REVENUE SERVICE,

    Defendant.

## MEMORANDUM OPINION

This adversary proceeding came before the court on March 11, 2010, for hearing on the United States' Motion for Partial Summary Judgment. (AP Doc. 37). Gregory L. Jones appeared on behalf of the Internal Revenue Service, United States of America ("IRS"); Frederick Mott Garfield appeared on behalf of James Patrick O'Neal ("Debtor"). After consideration of the evidence submitted and the arguments of the parties this court **DENIES** the IRS' Motion for Partial Summary Judgment.

## JURISDICTION

The Bankruptcy Court has jurisdiction of this case pursuant to 28 U.S.C. § 1334(a). This court has jurisdiction of this issue, a core bankruptcy proceeding, pursuant to 28 U.S.C. § 157(b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United

1

Case 08-70024-CMS    Doc 50    Filed 08/26/10    Entered 08/26/10 09:47:41    Desc Main
Document      Page 1 of 13

States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

## FINDINGS OF FACT

Debtor filed a voluntary, no asset Chapter 7 bankruptcy petition with this court on March 27, 2008. (Bk Docs. 1 & 19). At the time of the filing of this bankruptcy petition, Debtor was aware that he was indebted to the IRS for Form 1040 taxes and attendant penalties and interest for, inter alia, tax years 1994, 1995, 1996, 1997, 1998, 1999, 2002 and 2003. (AP Doc. 1). On June 25, 2008, Debtor filed this adversary proceeding seeking a determination that the tax liabilities due for the tax years listed above were dischargeable, alleging that such liabilities do not constitute priority debt. (AP Doc. 1). The IRS filed its answer on October 7, 2008, asserting that the tax liabilities were excepted from discharge pursuant to § 523(a)(1)(C). (AP Doc. 7).

Debtor is an attorney who began his career working at a CPA firm doing tax work in 1976. (AP Doc. 44, Page 11-13) That tax work consisted mainly of tax planning and tax accruals for major financial corporations. Debtor did very little actual tax return work, but admits that he was knowledgeable about the tax code in place at that time. Debtor left the CPA firm in 1980 to work for an established law firm in Birmingham, Alabama, where he worked on lawsuits involving securities litigation against stockbrokers and insurance agents.

Debtor got married in 1977, and moved into a home located at 4005 Montevallo Road in 1978. (AP Doc. 44, Page 47). The house was small, and Debtor and his wife decided to build additions when their daughter was born in 1982. (AP Doc. 44, Page 63). A few years later, they decided to build a bigger house. Because their house was on a large lot, Debtor and his wife decided to split the lot and build a new home next door. Construction on the new house started in 1986. (AP

2

Doc. 44, Page 47). Construction greatly exceeded the budget Debtor prepared and cost much more than Debtor anticipated, but the house was completed in 1988; Debtor and his family moved in that same year. (AP Doc. 44, Page 48 & 61). Debtor sold 4005 Montevallo Road when he and his family moved into the new house, and all proceeds of the sale went into the new house at 4007 Montevallo Road. (AP Doc. 44, Page 48).

In the late 1980's, there were changes to Debtor's law firm and the area of law in which he practiced that adversely affected Debtor's income. Around this time, Debtor's personal and business expenses began to exceed his income. In fact, in 1988, Debtor took out all the money he had put into the law firm's partnership retirement account. (AP Doc. 44, Page 61). Debtor never opened another retirement account. (AP Doc. 44, Page 61). In 1993, Debtor decided to temporarily leave the Birmingham law firm to work as a contract attorney on a series of large, lucrative cases. As a result of his work on these cases, Plaintiff was paid large legal fees and reported $362,000.00 in adjusted gross income for the 1994 tax year. (AP Doc. 37, Exhibit B, Line 31).

The IRS received Debtor's 1994 tax return on August 23, 1996. Debtor reported $362,200.00 in adjusted gross income. (AP Doc. 43, Second Declaration of Gregory L. Jones). Although Debtor's tax return was due on April 15, 1995, Debtor requested an extension. This request was granted and the new due date for the filing of Debtor's tax return was August 15, 1995. (AP Doc. 43, Exhibit D, Page 6). Debtor requested and was granted a second extension. The new due date for the filing of Debtor's tax return was October 15, 1995. (AP Doc. 43, Exhibit D, Page 6). As noted above, the IRS did not receive Debtor's 1994 tax return until August 23, 1996. Although Debtor asserts that this tax return was timely filed, there is no evidence of another extension. In fact, the documents produced by the IRS show that on March 6, 1996, there was an

3

"inquiry for non-filing of tax return." (AP Doc. 43, Exhibit D, Page 6). The IRS also charged Debtor a "penalty for filing tax return after the due date." (AP Doc. 43, Exhibit D, Page 6). Debtor stated that he filed his tax return after the initial April 15, 1995 deadline because he was attempting to avoid collection activity by the IRS. (AP Doc. 44, Page 143).

During 1994, Debtor did not make any quarterly estimated tax payments, nor did Debtor make any payment when he requested an extension of the filing date for his 1994 tax return. Despite knowing that he would have to pay taxes on the large sum of money he received in 1994, Debtor did not make any payments on the taxes due for the 1994 tax year. Debtor asserts that he did not make payments on the taxes because there was no money available after he paid his living expenses and paid back other creditors to whom he owed money. (AP Doc. 44, Pages 111-112). Debtor specifically stated in his deposition that he paid back some $60,000.00 in past-due credit cards on which he had charged living expenses; that he might have paid back some 90-day notes from the bank that he borrowed in order to pay living expenses; that he paid his former law firm anywhere from $50,000.00 to $150,000.00 in order to repay past due firm overhead expenses. (AP Doc. 44, Pages 74-75).[1] There is some evidence that Debtor also paid $50,000.00 to the IRS in 1994 for payment of back taxes. O'Neal v. O'Neal, 678 So. 2d 161, 163 (Ala. Civ. App. 1996).

In his deposition, Debtor asserted that his monthly expenses during 1994 were between $5,000.00 and $7,000.00 per month. Debtor asserted that he paid $4,000.00 per month for mortgage payments on the marital home; and $1,000.00 per month for his American Express bill. Debtor also had to pay monthly bills for food, clothing, electricity, and a cell phone. (AP Doc. 44, Page 76).

---

[1]Debtor further stated that some of the debts that he paid back were outstanding when Debtor and his family took a four-day vacation to London, England. (AP Doc. 44, Page 96).

Debtor did not have any regular monthly business expenses in 1994 because the attorney he contracted with paid all overhead expenses. (AP Doc. 44, Page 74).

Although 1994 was Debtor's peak income year due to legal fees from the settlement of a large case, it was also the year that Debtor got divorced. Financial difficulties caused strain on Debtor's marriage, and the divorce was finalized in August of 1994 after a trial on the merits. Debtor subsequently filed an appeal of the trial court's decree, but the appeal was unsuccessful. Pursuant to the divorce decree, Debtor was required to pay $1,500.00 per month in alimony, $1,200.00 per month in child support, and roughly $4,000.00 per month to keep up the house payment.[2] (AP Doc. 44, Page 59-60). In her deposition, Debtor's ex-wife asserts that Debtor did not make all of the child support and alimony payments. Specifically, the Debtor's ex-wife states that in 2000, Debtor owed her over $100,000.00 in back alimony and child support. (AP Doc 45, Page 19) This arrearage would account for 37 months of alimony and child support from 1994 through 2000. The divorce decree also required that Debtor pay his ex-wife's attorney's fees and a $10,000.00 marital debt. (AP Doc. 44, Page 59). There is no evidence as to whether or not the Debtor paid these obligations.

Because Debtor was no longer living in the marital home, he also had to pay $1,000.00 a month to rent an apartment for himself. (AP Doc. 44, Page 78). Debtor also continued to pay for his daughter's school and extracurricular activities, which included horse activities and dance. (AP

---

[2]Debtor appealed his divorce decree to the Civil Court of Appeals of Alabama. In the written opinion handed down by that court, the recitation of facts states that Debtor was ordered to pay $1,200 in child support, $1,500 in alimony, to maintain a $1,000,000.00 life insurance policy and to maintain medical and dental insurance coverage on Debtor's minor child. O'Neal v. O'Neal, 678 So. 2d 161, 163 (Ala. Civ. App. 1996). The trial court also ordered that Debtor and his wife sell the marital home and split the proceeds. Id. Debtor's ex-wife was to live in the marital home pending its sale, and Debtor was to make the $2,700.00 mortgage payments. Id.

Doc. 44, Page 79). Specifically, Debtor paid for riding lessons every week (some weeks his daughter took multiple lessons), dance lessons every week, and at least three summer camps every year. (AP Doc. 44, Page 83-90). Debtor stated that at the time of his divorce he had $80,000.00 in cash and that he used this money to pay for his own living expenses and to comply with the divorce decree. (AP Doc. 44, Page 119, 120-121). Debtor stated that the judge presiding over his divorce would not allow Debtor to set aside any reserve to pay taxes. (AP Doc. 44, Page 113).

Debtor's ex-wife testified in her deposition that Debtor purchased a Lexus and also joined the Old Overton Country Club in 1994. (AP Doc. 45, Page 26).

## CONCLUSIONS OF LAW

On March 27, 2008, Debtor filed a voluntary Chapter 7 bankruptcy petition. On June 25, 2008, Debtor commenced an adversary proceeding in this court by filing a complaint seeking a determination that his tax liabilities for the 1994, 1995, 1996, 1997, 1998, 1999, 2002 and 2003 tax years were dischargeable because such liabilities did not constitute priority tax liability. The IRS opposed the relief requested and asserted in its answer that Debtor had willfully attempted to evade and defeat the taxes owed for the 1994, 1995, 1996, 1997, 1998, 1999, 2002 and 2003 tax years, and therefore, the tax liabilities for those years were excepted from discharge pursuant to § 523(a)(1)(C). In further opposition, the IRS filed this Motion for Partial Summary Judgment seeking a determination by this court that the tax liability for the 1994 tax year is excepted from discharge pursuant to § 523(a)(1)(C) as a matter of law.

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings pursuant to Bankruptcy Rule 7056, governs the procedures for summary judgment and provides in pertinent part: "The judgment sought should be rendered if the pleadings, the discovery and

6

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(c)(2). In reviewing a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "The burden of showing the absence of any genuine dispute as to material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The court will now determine whether the IRS has shown that there is no genuine issue as to any material fact and that the IRS is entitled as to judgment as a matter of law on the issue of whether the debt owed to it is dischargeable pursuant to § 523(a)(1)(C).

An individual debtor who files a petition under Chapter 7 of the Bankruptcy Code is generally granted a discharge from all debts that arose before the filing of the bankruptcy petition. 11 U.S.C. § 727(b). However, certain acts or conduct of the debtor can lead to the forfeiture, either in whole or in part, of such discharge. See, e.g., 11 U.S.C. § 523. At issue here is whether the exception to a debtor's general discharge laid out in § 523(a)(1)(C) is applicable in this case. "Exceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor." U.S. v. Fretz (In re Fretz), 244 F. 3d 1323, 1327 (11th Cir. 2001). Section 523(a)(1)(C) provides:

> (a) A discharge under section 727 . . . . of this title does not discharge an individual debtor from any debt-
>     (1) for a tax or a customs duty -
>         (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

11 U.S.C. § 523(a)(1)(C). Pursuant to § 523(a)(1)(C), there are two circumstances under which a tax debt owed by a debtor is excepted from discharge. The first circumstance is applicable when a
7

debtor "made a fraudulent return." Because the IRS does not contend that Debtor "made a fraudulent return," the first circumstance is not at issue in this case. The second circumstance is applicable when a debtor "willfully attempted in any manner to evade or defeat such tax." Because the IRS contends that Debtor "willfully attempted in any manner to evade or defeat" the taxes owed for the 1994 tax year, the second circumstance is at issue in this case.

"The plain language of the second prong of § 523(a)(1)(C) contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax') and a mental state requirement (that the attempt was done 'willfully')." In re Fretz, 244 F. 3d at 1327 (quoting 11 U.S.C. § 523(a)(1)(C)). To prove that the debt owed to the IRS is not excepted from discharge pursuant to § 523(a)(1)(C), the IRS must establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law as to all elements of § 523(a)(1)(C). Therefore, the IRS must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law as to both the conduct requirement and the mental requirement contained in § 523(a)(1)(C).

"[T]he conduct requirement of § 523(a)(1)(C) is not satisfied where a debtor has filed accurate tax returns and simply failed to pay taxes . . . .The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes . . . ." Id. at 1328-29. The uncontroverted evidence in this case shows the following: Debtor requested two extensions of the filing date for his 1994 tax returns; Debtor was granted both extension requests, and the new deadline for the filing of his 1994 tax returns was October 15, 1995; the IRS did not receive Debtor's 1994 tax return until August 23, 1996; Debtor testified at his deposition that he filed his tax return after the initial April 15, 1995 deadline because he was attempting to avoid collection activity by the IRS. These facts clearly show that Debtor engaged in "affirmative acts to

8

avoid payment or collection of taxes." Debtor sought extensions of the deadline for filing taxes, affirmative acts by him, in order to avoid the collection of taxes. The IRS has proven that Debtor's actions satisfy the conduct requirement of § 523(a)(1)(C) as a matter of law.

The mental requirement of § 523(a)(1)(C) requires that the attempt to evade collection of taxes be done "willfully." 11 U.S.C. § 523(a)(1)(C). The willfulness requirement "'prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate.'" Id. (quoting In re Birkenstock, 87 F. 3d 947, 952 (7th Cir. 1996)) "[A] debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally." In re Fretz, 244 F. 3d at 1330. "Fraudulent intent is not required." Id. Therefore, the IRS must prove the following statements are true in order to prove that Debtor "voluntarily, consciously or knowingly, and intentionally" avoided his obligation to pay taxes as a matter of law: (1) Debtor had a duty to file income tax returns and pay taxes; (2) Debtor knew he had a duty to file income tax returns and pay taxes; and (3) Debtor voluntarily and intentionally violated the duty to file income tax returns and pay taxes. Id. In his deposition, Debtor testified that he knew he was required to pay taxes and that he did not make any payments to the IRS because there was no money available after he paid his living expenses and other creditors, namely his ex-wife. Based upon Debtor's own testimony, it is undisputed that Debtor had a duty to pay taxes and that he was aware of that duty. Therefore, the IRS must prove by uncontroverted evidence that Debtor voluntarily and intentionally violated his duty to file income tax returns and pay taxes. The IRS argues that Debtor made a conscious choice not to pay his taxes because Debtor had enough funds to pay his taxes, but chose to use his financial resources for other purposes. The IRS made a similar argument in the

9

Case 08-70024-CMS    Doc 50    Filed 08/26/10    Entered 08/26/10 09:47:41    Desc Main
Document      Page 9 of 13

Haas case handed down by the Eleventh Circuit Court of Appeals, and this was the Court's response:

> Her failure to pay the IRS is the result not of dishonesty but of the defining characteristic of all debtors-honest and dishonest, alike-insufficient resources to honor all of her obligations. Similarly, Haas technically had the financial ability to pay his taxes, but he still lacked the resources to pay all of his debts. That he decided to use his limited funds to satisfy obligations other than his properly acknowledged income taxes does not render him a dishonest debtor, simply a debtor.

Hass v. Internal Revenue Service (In re Haas), 48 F.3d 1153, 1156 (11th Cir. 1995), *overruled on other grounds by* Griffith v. United States of America (In re Griffith), 206 F.3d 1389, 1395-96 (11 th Cir. 2000).[3] Despite this language of the Eleventh Circuit Court of Appeals, this court feels that there is room to find that debtors with limited financial resources willfully failed to pay taxes.

> "Debtors with an ability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their debts excepted from discharge."

Lacheen v. Internal Revenue Service (In re Lacheen), 365 B.R. 475, 486 (Bankr. E.D. Pa. 2007) (quoting United States of America v. Angel (In re Angel), No. 93-1230, 1994 WL 69516, at *4 (Bankr. W.D. Okl. Feb. 24, 1994)). In reconciling these two statements, this court has come to the conclusion that a debtor who is unable to pay his taxes because he expended his limited financial resources on legitimate business expenses and/or necessary living expenses, or because he paid creditors who were owed money as a result of any of the previously listed items, has not willfully failed to pay his taxes; however, a debtor who is unable to pay his taxes because he expended his limited financial resources on illegitimate business expenses, unnecessary living expenses, luxury items, or because he paid creditors who were owed money as a result of any of the previously listed

---

[3] It is not clear from the facts recited in the Haas case what income the debtor was receiving during the years he did not pay his taxes. It also is not clear whether the debtor in Haas was ever the recipient of a large sum of money with which he could have paid his tax obligations.

10

items, such debtor has willfully failed to pay his taxes. Based upon the evidence submitted, this court is unable to determine whether Debtor falls into the latter category without making a determination as to Debtor's credibility. In other words, this court finds that there is an issue of material fact as to whether Debtor used the monies he received in 1994 for legitimate business expenses and/or necessary living expenses or whether he used such monies for other purposes. A detailed analysis of the court's findings follows.

Debtor received roughly $360,000.00 in adjusted gross income during 1994. However, Debtor testified in his deposition that he paid living expenses and various other creditors so that when the time came to pay the IRS, there was no money left. Debtor stated in his deposition that he paid between $50,000.00 and $150,000.00 in past-due overhead expenses to a former employer. While the court believes this to be a legitimate business expense because Debtor planned to return to work at his former employer, a fact dispute remains as to how much money he paid; a $100,000.00 margin of error is simply not acceptable. (The Debtor's 1994 tax return reflects taxes due of $129,941.00.) In addition, Debtor testified in his deposition that he paid off credit cards and 90-day notes when he received the lump-sum attorney fees in 1994. He also testified that he had put living expenses on his credit card and that he took out the 90-day notes to pay for living expenses. However, there is no indication of what Debtor's personal expenses were for the time period in question. For example, it is not clear how much Debtor paid in rent each year, how much Debtor paid in utility bills each year, how much Debtor spent on food each year, or how much Debtor spent on clothing each year. The court has no evidence as to the cost of the vacations Debtor and his family took in the years when Debtor did not pay his taxes, nor information regarding the amount of money that Debtor spent per month on his daughter's extracurricular activities. In addition, this

11

court has no explanation as to why Debtor purchased a Lexus, a luxury vehicle, and also joined the Old Overton Country Club in 1994.

While there is little information about the kinds and amounts of expenditures that Debtor paid in 1994, there are also discrepancies between Debtor's account of expenditures and his wife's account of expenditures. For instance, Debtor testified at his deposition that he paid the mortgage on the family home pursuant to the divorce decree, but it is unclear what amount he paid: Debtor states in his deposition that he paid around $4,000.00 per month, but the divorce decree states that Debtor paid $2,700.00 per month. The foreclosure on the residence raises a question as to whether or not the Debtor was paying any amount on the mortgage. Debtor also testified that he could not pay his taxes for the year 1994 because he was obligated to pay alimony and child support to his ex-wife; however, Debtor's ex-wife testified in her deposition that Debtor was not paying his monthly alimony and child support obligations during the time period in question.

Annualizing the Debtor's expenses, considering the conflicting evidence, gives wide discrepancies in where the Debtor's money was going. Annual mortgage payments could have been as high as $48,000.00 per year ($4,000.00 per month) or $32,400.00 ($2,700.00 per month) or zero, if the Debtor was not making the mortgage payments as the mortgage foreclosure suggests. Annual child support and alimony payments would be $32,400.00, if paid by the Debtor, but the ex-wife's deposition suggests this was not being paid, at least not in full. Debtor's living expenses, by the Debtor's testimony, could have been as high as $84,000.00 per year ($7,000.00 per month) or as low as $60,000.00 per year ($5,000.00 per month). The Debtor's repayment to his law firm for expenses, from the evidence, could be as high as $150,000.00 or as low as $50,000.00.

In short, there are discrepancies between Debtor's account of events, the ex-wife's account

12

of events, and the account of events detailed in the divorce decree. There is no uncontroverted evidence detailing the personal expenditures of Debtor during the relevant time period. Without such uncontroverted evidence, this court cannot find, as a matter of law, that Debtor voluntarily and intentionally violated the duty to file income tax returns and pay taxes for the year 1994.

While a trial on the merits may show that Debtor did willfully attempt to evade or defeat his duty to pay income taxes for the tax year 1994, the IRS failed to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on the issue. Therefore, the IRS's request for summary judgment as to that issue is due to be denied.

## CONCLUSION

The court finds that the IRS failed to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law as to the cause of action brought pursuant to § 523(a)(1)(C). Therefore, the court **DENIES** the IRS's Motion for Partial Summary Judgment.

**DONE and ORDERED** this August 26, 2010.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

13